ALICE M. HICKLAND, Respondent-Appellant, *v.* RICHARD A. HICKLAND et al., Appellants-Respondents. (Action No. 1.)

ALICE M. HICKLAND, Respondent-Appellant, *v.* RICHARD A. HICKLAND et al., Appellants-Respondents. (Action No. 2.)

Third Department, November 7, 1974.

*Carusone & Carusone (John J. Carusone, Jr.,* of counsel), for Richard A. Hickland, appellant-respondent.

*Thomas A. Ford* for Adelaide H. Eaton, appellant-respondent.

*John S. Hall (James Cooper* of counsel), for respondent-appellant.

HERLIHY, P. J. Plaintiff Alice Hickland and defendant Richard Hickland were married on July 20, 1946. During their marriage, the parties purchased several pieces of real property and accumulated stocks, bonds and savings accounts. The realty involved in this case included a camp known as the Cossayuna Lake property and valued at approximately $10,000; a residence and farm known as Argyle property and valued at approxi-

mately $50,000; and a residence and farm known as the Salem property and valued at approximately $32,500.

The plaintiff and defendant Hickland resided as husband and wife at the Salem property until January 14, 1972 when the parties separated. From January 14, 1972, defendant Hickland lived with his sister, defendant Eaton; the plaintiff continued to reside on the Salem property and the Hicklands entered into negotiations conducted by attorneys for the settlement of their marital problems and the resolution of the future ownership of their various assets. As a result of the negotiations, a separation agreement was prepared in its final form by defendant Hickland's attorney and was signed by the plaintiff on March 21, 1972 and by defendant Hickland on April 5, 1972.

Among other things, the separation agreement provided that the plaintiff was to receive $12,500 in cash or equivalent securities; that defendant Hickland was to pay $150 per month for child support and provide for the college education of the parties' son; that " certain " bank accounts and securities that were individually and/or jointly owned by the parties were to be turned over solely to defendant Hickland; that the *Salem property* was to be conveyed to the plaintiff as sole owner; that the Cossayuna and Argyle properties were to be conveyed to the defendant Hickland as sole owner; that the plaintiff agreed not to incur any debts after the execution of the separation agreement for which the defendant Hickland would be liable. When defendant Hickland signed the separation agreement on April 5, 1972 he also signed most of the documents which were required by the agreement for the transfer of the real and personal property to the plaintiff and/or himself.

About 10 days after the April signings by defendant Hickland, he traveled to Europe. While in Europe, he received a letter from his attorney to the effect that the plaintiff was altering something in regard to finalizing the division of the property and, in May of 1972, he received a letter (referred to as the " Libra " letter) from his wife to the effect that she wanted to retain certain bank savings accounts. He returned to the United States on or about June 3, 1972.

Subsequent to the signing of the separation agreement, the plaintiff and her attorney went to the office of the attorney for defendant Hickland in May of 1972 and the plaintiff signed various documents including deeds for the Cossayuna and Argyle properties as required by the separation agreement for the conveyance of such properties to defendant Hickland. At the time the plaintiff executed the deeds, she delivered some

bank books to defendant Hickland's attorney, but withheld others. The record establishes that the deeds either were not complete or required corrections at the time they were signed by the plaintiff, and that such deeds were to be completed thereafter by defendant Hickland's attorney.

Defendant Hickland testified that, upon his return from Europe, he attempted to contact his wife and make arrangements to carry forward the terms of the separation agreement, but was unsuccessful. Some time in June of 1972 defendant Hickland paid his attorney for the services rendered in regard to the separation agreement and received his file. Defendant Hickland testified that the deeds signed by his wife and himself and left with his attorney were not in his file when he received it from his attorney but were thereafter received by him. Defendant Hickland's attorney testified that he had recorded the deeds to the Cossayuna and Argyle properties and the deeds show they were recorded on June 16, 1972.

The parties apparently made no further attempts to carry out the provisions of the agreement after the alleged telephone call of defendant Hickland to the plaintiff in June of 1972. The plaintiff's attorney testified that, in August of 1972, he terminated his relationship with plaintiff. He also testified that he never received a deed from defendant Hickland conveying the Salem property to plaintiff and the record establishes that such a deed was never delivered to plaintiff.

On July 1, 1972 defendant Hickland entered into an agreement with his sister, defendant Eaton, which required him to convey the Salem, Argyle and Cossayuna properties together with certain securities to his sister. This agreement recites valuable considerations to be provided by defendant Eaton and will be further considered at a later point in this decision as to its legal effect upon the rights of plaintiff vis-á-vis defendant Eaton. Defendant Eaton held executed deeds to herself at the time of trial.

The foregoing facts are those having particular relevance to the trial court's finding that the separation agreement was either null and void in its inception or was duly repudiated and rescinded by the parties.

The record contains no facts which would support the finding that the separation agreement was not a valid agreement as of the time of the signing thereof by both parties and the alternative finding by the trial court that it was not valid at inception is reversed and it is found that the agreement was

valid and binding as of April 5, 1972 when signed by defendant Hickland.

A separation agreement, like any other contract, may be terminated by the mutual assent of the parties and it will thereupon be rescinded as to future obligations. (See *Cavellier* v. *Cavellier,* 4 A D 2d 600, 602; *Randolph* v. *Field,* 165 App. Div. 279.) Furthermore, the mutual assent of the parties to a repudiation and rescission of the agreement may be found from the acts of the parties and need not be in the form of an express agreement (*Cavellier* v. *Cavellier, supra; Randolph* v. *Field, supra*).

The record establishes that both parties have fully repudiated the separation agreement by their acts in regard to their obligations thereunder. The trial court did not find an exact date in regard to the time when the agreement was mutually repudiated and to be considered as rescinded. In this regard, the trial court did not find that the plaintiff had in fact repudiated the agreement by a substantial breach thereof. The record contains unresolved questions of fact as to whether or not the bank accounts which the plaintiff sought to keep for her sole use in her letter to defendant Hickland were in fact required by the separation agreement to have been transferred by her to defendant Hickland. However, the May, 1972 letter from plaintiff to defendant Hickland establishes, upon its face, that the plaintiff then considered that she was under some obligation by virtue of the agreement to transfer such accounts to defendant Hickland. The plaintiff's May, 1972 letter, though, cannot be construed as an unequivocal act of repudiating the agreement, but rather was merely an attempt to further negotiate the terms of the separation agreement.

The record establishes through the testimony of defendant Hickland that he at all times considered that the bank accounts were required to be transferred to him. It also appears that defendant Hickland was aware that the plaintiff was seeking to alter her obligations under the agreement as early as May of 1972. However, the defendant Hickland was finally made aware of the fact that the plaintiff unequivocally did not intend to turn over the subject bank accounts when he telephoned her in June of 1972.

It having been established that the defendant, in June of 1972, was made aware of the unequivocal intent of the plaintiff to disaffirm the separation agreement, the question becomes one of when he acquiesced in such disaffirmance as to establish a mutual assent to a rescission of the separation agreement. The

sole act in the record which unequivocally establishes the acquiescence of defendant Hickland in the plaintiff's disaffirmance of the agreement was the signing of the agreement on July 1 with defendant Eaton which required him to convey the Salem property to Eaton, contrary to his obligations under the separation agreement. By virtue of his transfer of the Salem property, specific performance of the separation agreement was rendered impossible and thus, the record establishes that there was a mutual assent to the termination and rescission of the separation agreement as of July of 1972. For the foregoing reasons, the finding of the trial court that the separation agreement had been repudiated and rescinded is supported by the weight of the evidence in the record and so much of the judgment appealed from as declares the agreement to be rescinded must be affirmed.

However, prior to the repudiation and rescission of the separation agreement, the plaintiff had, in fact, signed the appropriate documents to convey to defendant Hickland her interests in the Cossayuna and Argyle properties. At the time the deeds were signed, the separation agreement had not yet been repudiated and, inasmuch as the delivery of the deeds to defendant Hickland occurred prior thereto, the deeds were merely in furtherance of the plaintiff's obligation under the separation agreement which was then extant. It is evident that, insofar as the transfer of title from the plaintiff to the defendant Hickland is concerned, the plaintiff has failed to establish any facts which would affect the validity of that transfer of title *insofar as the separation agreement is concerned.*

The plaintiff's attorney did testify that, at the time the deeds were signed by the plaintiff at the office of the attorney for defendant Hickland, there was a mutual agreement between himself and the defendant Hickland's attorney that the documents would not be exchanged by the parties until all documents necessary to carry out the provisions of the separation agreement had been completed and exchanged.

Defendant Hickland's attorney testified at the trial herein. However, he was neither asked to confirm nor deny the assertion by plaintiff's attorney that the documents were to be held in any form of escrow. The separation agreement makes no provision in regard to a mutual exchange of any documents required to effectuate the provisions thereof and in paragraph EIGHTEENTH thereof it provides that: " Each of the parties, on request, agrees further at any time and from time to time to make, execute, and deliver all instruments necessary to

effectuate the provisions of this agreement." The record does not establish that the attorney for defendant Hickland was authorized to vary the terms of the separation agreement and there is no evidence that defendant Hickland assented to any attempted variance of the provisions of the quoted paragraph EIGHTEENTH until July of 1972. The trial court in its decision found that there was an escrow agreement in regard to the deeds; however, it does not appear that there was any valid escrow agreement. (Cf. *Farago* v. *Burke*, 262 N. Y. 229.)

The present record does not establish any evidence of fraud insofar as the obtaining of record title by the defendant Hickland to the Argyle and Cossayuna properties is concerned. There is no evidence that, at the time defendant Hickland acquired record title to the Cossayuna and Argyle premises, he had any knowledge that the deeds were supposed to have been held by his attorney pending complete execution of all other necessary documents in regard to the separation agreement or that there had been any conditional delivery of the deed. While it may well be that the record is sufficient to establish such a conditional delivery of the deed by the plaintiff as to render the deed void and of no effect as to defendant Hickland, such a state of affairs would not necessarily divest defendant Eaton of title to the subject premises. (Cf. *Hamlin* v. *Hamlin*, 192 N. Y. 164; *Ten Eyck* v. *Whitbeck*, 156 N. Y. 341; *Coventry* v. *McGreery*, 144 App. Div. 68.)

Rescission is a proper remedy in this case since the fundamental purpose of the separation agreement was to alter the marital status of the parties and provide by contract for the future status of their marital obligations and in regard to that purpose the parties can be returned to *status quo ante* by rescission. Nevertheless, it is apparent that, inasmuch as defendant Hickland had conveyed the Argyle and Cossayuna premises, which had been conveyed to him prior to any effective rescission, the plaintiff, upon seeking rescission, cannot be restored to her prior position in regard to those properties by her husband. In this particular case, the effect of rescission for a fundamental breach of the agreement is limited to the obligations of the parties under the separation agreement and defendant Eaton was not a party to such agreement. It would seem that defendant Hickland, having elected to assent to a repudiation and rescission of the separation agreement, should, in equity, be required to return to the plaintiff the title to the Argyle and Cossayuna properties. Nevertheless, such is an impossibility in view of the apparent rights acquired by the defendant Eaton, if validly acquired.

As noted hereinabove, there was no valid escrow agreement in regard to the deeds with defendant Hickland's attorney and the grantor, plaintiff, duly caused the executed deeds to pass out of her possession. This case is similar to *Simson* v. *Bank of Commerce* (43 Hun 156) wherein the court held that, in circumstances similar to the present facts, the grantor having provided a duly executed deed and thereby made the transfer of title possible, would be estopped from relying upon a conditional delivery as against innocent third parties. As observed by the trial court in its decision, the question of what, if any, rights the plaintiff may have against defendant Eaton must be determined by considering the factual and legal question of whether or not defendant Eaton was an innocent third party and a holder of title for value without notice and in good faith. (See *Hamlin* v. *Hamlin, supra*; cf. *Ten Eyck* v. *Whitbeck, supra.*)

There is nothing in this record which establishes that defendant Eaton had actual knowledge that the plaintiff had an ownership interest in the Argyle and Cossayuna Lake properties. A search of the recorded title at the time of the July conveyance would have only disclosed defendant Hickland as the sole owner of the property. The record also establishes that the plaintiff continued to reside on the Salem property. If we assume that, prior to accepting title, defendant Eaton should have inquired of the plaintiff as to her continued residence on the Salem property, the most that such knowledge would have done would be to alert defendant Eaton to a possible claim of the plaintiff in regard to the Salem property. It does not appear that the plaintiff, at the time of the transfer of title to defendant Eaton, was in possession of the Argyle and Cossayuna properties and, in this regard, there was no reason for any consultation by defendant Eaton with the plaintiff. (See *Cornell* v. *Maltby,* 165 N. Y. 557.)

However, the trial court found that defendant Eaton was aware of the marital difficulties between the plaintiff and defendant Hickland, generally knew of the property settlement contemplated by the parties in the separation agreement, and resided with her brother. Those findings are supported by the weight of the evidence. The familial relationship of defendant Hickland and defendant Eaton does not in and of itself provide a basis for a finding that defendant Eaton was on notice of any defect in defendant Hickland's title to the two properties. However, such relationship, in addition to defendant Eaton's overall knowledge, is sufficient to require defendant Eaton to have

inquired as to any defects in defendant Hickland's title to the properties since defendant Eaton had knowledge of facts that would lead a reasonably prudent purchaser to make inquiry. (See *Royce* v. *Rymkevitch*, 29 A D 2d 1029, 1030; 1 Warren's Weed, N. Y. Real Property, Bona Fide Purchaser, § 1.05.) Consequently, by defendant Eaton's failure to make such inquiry, she cannot be found to be a bona fide purchaser of the Argyle and Cossayuna properties. The Salem property, though, was free and clear of any claim which might be made by the plaintiff since the separation agreement had been rescinded.

In addition, if the consideration paid by defendant Eaton pursuant to her agreement with her brother which obviously would alienate a substantive part of defendant Hickland's assets, is merely nominal or if in fact there was no true alienation intended, then a valid inference that defendant Eaton had notice of the plaintiff's rights or claims might arise. In this regard, the plaintiff presented expert evidence that all of the real properties involved herein had a value of about $96,500. The precise value of the livestock and farm equipment transferred by defendant Hickland to defendant Eaton is not established in this record but it seems obvious that, at the time of the transfer, there would be a substantial value attached thereto. In addition to the real property and the livestock and farm equipment, securities having a market value of $16,000 were also transferred to defendant Eaton. It is thus apparent that the value of the assets being transferred from the defendant Hickland to defendant Eaton was in excess of $112,500. As consideration on the part of defendant Eaton, she canceled a debt owed to her by defendant Hickland (which debt was not disputed by the plaintiff) having a balance of principal and interest of $19,100; and agreed to pay the amount of $21,000 for the education of Cole Hickland, son of defendant Hickland, if the said son were to attend college; and further obligated herself to pay the sum of $30,000 to Leslie A. Hanks and Cole H. Hickland, children of defendant Hickland and the plaintiff, upon the death of defendant Hickland. Thus, the agreement gave rise to cash obligations on the part of defendant Eaton and/or canceled debts for a total of $70,100. Furthermore, the agreement provided that defendant Hickland would receive 10% of the profits of the farm operations and a home to be located on the Argyle premises until June 30, 1977 or upon the happening of certain events until February 1, 1989. The record established that the Argyle premises had a house located thereon at the time of the transfer to defendant Eaton; however, the

house had been vacant and unoccupied for about five years and required considerable remodeling, which was done by defendant Eaton after she acquired title. While the precise costs and values attributable to the providing of a residence upon the Argyle farm are not immediately apparent, certainly the value thereof and the detriment to defendant Eaton in providing such a home is considerable. It cannot be said upon the record that the agreement between the defendant Hickland and the defendant Eaton was not an apparent valuable consideration on the part of the defendant Eaton. However, the actual consideration is affected by the illusory nature of the agreement.

The trial court found that the agreement between the defendant Eaton and defendant Hickland was " illusory " insofar as the real property conveyed to defendant Eaton pursuant thereto was concerned. The agreement upon its face and the situation of the marital relationship of the plaintiff and the defendant Hickland at the time the agreement with the defendant Eaton was entered into together with her prior general knowledge of the property settlement intended by the parties, does establish facts to support the trial court's finding that there was a studied attempt by the defendants to place the property of defendant Hickland out of the plaintiff's reach. The provisions in the agreement for the continued management of the conveyed securities by defendant Hickland and the agreement as a whole reasonably supports a sole inference that the parties intended that defendant Eaton hold title only for the benefit of defendant Hickland as to the Cossayuna and Argyle properties. Accordingly, defendant Eaton was not a *genuine* purchaser of the Cossayuna and Argyle properties and, therefore, is not a bona fide purchaser. Upon the present record and particularly in regard to the family relationships of all of the parties hereto, the trial court's finding that the agreement between defendant Eaton and defendant Hickland was illusory must be affirmed.

Nevertheless, as a result of the rescission of the separation agreement herein, the Salem property is not affected by any illusory aspects of the agreement between defendants Eaton and Hickland insofar as any rights of the plaintiff are concerned. Upon this record, the plaintiff failed to establish any facts which would affect the title to the Salem property as held by defendant Eaton and, therefore, the trial court's refusal to set aside the title to the Salem property was correct.

In respect to the cross claim of defendant Eaton against the defendant Hickland, it having been found that the contract or agreement between the defendants Eaton and Hickland was

illusory and never intended to be consideration for any conveyance of properties to the defendant Eaton, it does not appear that she would have any basis for seeking damages from the defendant Hickland for any breach of the agreement by him or any failure of his consideration supporting the said agreement. While the expenditure of moneys by the defendant Eaton in regard to improvements upon the real property at Argyle is an enrichment of her brother, defendant Hickland, and the plaintiff, it does not appear that there was anything about such enrichment as was unjust. While under all of the circumstances there might be an implied agreement on the part of the defendant Hickland to reimburse defendant Eaton for out-of-pocket moneys, such was not the theory of the cross claim as pleaded by defendant Eaton. Nevertheless, defendant Hickland did not answer the cross claim and, accordingly, the trial court erred in dismissing the cross claim, apparently upon the theory that defendant Eaton simply could not recover. In regard to the cross claim of defendant Eaton the judgment must be modified and the matter remitted for the purpose of taking proof thereon as to damages and the entry of judgment.

Other issues are argued by the parties upon this appeal but they are without substantial merit, and it is concluded on the present record that the judgment should be modified by striking so much thereof as dismissed the cross claim of the defendant Eaton and by a continuance of the cross claim for assessment of damages and entry of an appropriate judgment thereon and, as so modified, the judgment should be affirmed, without costs.

Staley, Jr., Kane, Main and Reynolds, JJ., concur.

Judgment modified, on the law and the facts, by striking so much thereof as dismissed the cross claim of defendant Eaton and by a continuance of the cross claim for the assessment of damages and entry of an appropriate judgment thereon, and, as so modified, judgment affirmed, without costs.